GLICKSTEIN, Judge.
This case may ultimately result in an order granting North Broward Hospital District summary final judgment against a former sheriff on his third party complaint, *1323 but in our opinion there are unresolved factual issues which are material.
The case involves a prisoner who escaped in 1977 from Las Olas Rehabilitation Center in Fort Lauderdale after being delivered there by a deputy sheriff, and weeks later beat up a turnpike employee at the Jupiter toll booth.
The assaulted party and her husband sued the then-current sheriff, alleging pre-escape and post-escape negligence. The sheriff sought third party relief on the theory that it was the hospital district which was responsible for the prisoner’s being at the Las Olas facility from which he escaped. There is competent evidence now in the record from which such responsibility could reasonably be inferred.
The supplemental record consists of three witnesses’ depositions — the emergency room physician, Dr. Mirabel, who examined the prisoner; the former deputy who transported the prisoner from the jail to Broward General Medical Center for psychiatric evaluation pursuant to a court order, then to the Las Olas facility; and the custodian of the sheriff’s transportation logs for the date of transport. The foregoing court order directed the sheriff to take the prisoner from the county jail to Bro-ward General Medical Center and return him to the jail, and expressly recited that the sheriff was responsible for the security of the prisoner during those times. The court ordered the hospital, which we know to be a public hospital, to examine the prisoner to determine if he should be involuntarily hospitalized.
Two of the three depositions were taken six years after the incident. They show that when the prisoner arrived at the hospital emergency room he was hallucinating, staring at the wall and non-responsive to the questions of the emergency room physician, a hospital employee who examined him. The physician then telephoned the psychiatrist on call, who recommended that the prisoner be sent to Las Olas. The emergency room physician did not know if the psychiatrist to whom she spoke, Dr. Hernandez, was a private physician, and did not know “what kind of arrangement he had.” She stated that the psychiatrist made the decision what to do with the patient; however, the hospital chart, from which she translated her handwriting, including such abbreviations as BGER, meant the following, according to her testimony:
“Doctor Hernandez gave order of admit, but no beds here. Patient should be sent to Las Olas on involuntary admission.” These were the recommendations of Bro-ward General Emergency Room.
She also translated what she had written after diagnosis to say:
Rule out schizophrenic paranoia.
Although there is a lot of finger-pointing by the defendant sheriff and third party defendants, no one apparently “owns up” to any responsibility, although the hospital chart plainly reflects the existence of the hospital district’s recommendation. Dr. Mirabel’s testimony reflects the following statements as well:
So I contacted Dr. Hernandez over the phone through the secretary of the emergency room physician, and when we talk I explain what the situation was. And he said, “well, send him to Las Olas.” And we had to commit him involuntarily. The man would not go in on his own accord. So what we used to do is signed ,a court order. All these papers are handled by the secretary of the unit, by the emergency room secretary. And she handled all the papers. And this is just an everyday procedure we do all the time.
Q. Okay. When you were informed that Dr. Hernandez wanted the patient sent to Las Olas to be admitted there, did you advise the officers of this?
A. Yeah. Well, we went there and talked to the officer, “Look, we don’t have any beds here. I talked to the psychiatrist. He wants to admit this patient at Las Olas, and he ought to be taken there.” And that was it. You know, and the officer said fine.
*1324 So the secretary of the staff will prepare all the papers. It’s a long paperwork. And she did everything, and then they take it from there. Once I do that, I don’t know what happened any more. I mean, I don’t have anything to do with that any more. I did my part, and I went to another patient.
So that’s it.
Q. Okay. But you did advise the officers?
A. Oh, yeah. I mean, these papers— Oh, yes, you go and tell the officers what’s going on. And they were very nice, you know. We never had any—
Q. Do you know who those officers were? For example, on the emergency room chart it says Deputy Kahn.
A. I don’t remember their names.

Q. Okay. As best you’re able to recall back in 1977, would these people customarily be admitted? The people who were going to be examined by court order would be admitted to the hospital?
A. Oh, yes, absolutely. Either at Broward, if we had beds; or at Las Olas. Usually we had to send the patients to Las Olas, because the amount of psychiatrist beds with security that we have at Broward was not enough for our bulk. So we are almost full to capacity. So most of these patients were sent to Las Olas.
Althbugh the transporting deputy testified as to general procedure, the foregoing specifics on the present record, in our view, warrant a trial to determine the relationship between the hospital and the subsequent events, particularly as the deputy had no recollection in 1983 whatsoever of the 1977 incident. Moreover, the record is unclear as to the relationship between the psychiatrist and Broward General Medical Center. It does not support, in its present state, the argument made by North Bro-ward Hospital District in its brief and at oral argument that he was not employed by the hospital. - Further, we have no way of knowing what security existed at the Las Olas facility; and if the security was inadequate, whether the district knew that fact.
If we can “reasonably” interpret the record, which we believe we have done, to show that Broward General Medical Center may have been a material influence or materially causative factor by its “recommendation” and extensive logistical followup in the prisoner’s non-return to the jail, notwithstanding the court order, then we believe jurors should have been the ones to resolve the issues, not the trial judge. We hearken back to Palsgraf v. Long Island Railroad, 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928). As Judge Friendly points out in Petition of Kinsman Transit Co., 338 F.2d 708 (2d Cir.1964):
The reason why the Long Island was thought to owe no duty to Mrs. Palsgraf was the lack of any notice that the package contained a substance demanding the exercise of any care toward anyone so far away; Mrs. Palsgraf was not considered to be within the area of apparent hazard created by whatever lack of care the guard had displayed to the anonymous carrier of the unknown fireworks.
Id. at 721 (footnote omitted).
We see no reason why an actor engaging in conduct which entails a large risk of small damage and a small risk of other and greater damage, of the same general sort, from the same forces, and to the same class of persons, should be relieved of responsibility for the latter simply because the chance of its occurrence, if viewed alone, may not have been large enough to require the exercise of care. By hypothesis, the risk of the lesser harm was sufficient to render his disregard of it actionable; the existence of a less likely additional risk that the very forces against whose action he was required to guard would produce other' and greater damage than could have been reasonably anticipated should inculpate him further rather than limit his liability. This does not mean that the careless actor will always be held for all damages for which the forces that he risked were a cause in fact. Somewhere *1325 a point will be reached when courts will agree that the link has become too tenuous — that what is claimed to be consequence is only fortuity. Thus, if the destruction of the Michigan Avenue Bridge had delayed the arrival of a doctor, with consequent loss of a patient’s life, few judges would impose liability on any of the parties here, although the agreement in result might not be paralleled by similar unanimity in reasoning; perhaps in the long run one returns to Judge Andrews’ statement in Palsgraf, 248 N.Y. at 354-355, 162 N.E. at 104 (dissenting opinion). “It is all a question of expediency, * * * of fair judgment, always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.” It would be pleasant if greater certainty were possible, ... but the many efforts that have been made at defining the locus of the “uncertain and wavering line,” 248 N.Y. at 354, 162 N.E. 99, are not very promising; what courts do in such cases makes better sense than what they, or others, say. Where the line will be drawn will vary from age to age; as society has come to rely increasingly on insurance and other methods of loss-sharing, the point may lie further off than a century ago.
Id. at 725-26.
The Restatement (Second) of Torts § 435 (1965), adopted by the American Law Institute, provides:
Foreseeability of Harm or Manner of Its Occurrence
(1) If the actor’s conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.
(2) The actor’s conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor’s negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.
Here, the hospital knew the prisoner’s provisional diagnosis was schizophrenic paranoia, and that the prisoner had to be involuntarily hospitalized. As the record now reads, it undertook to have that done, thus affirmatively interjecting itself into the chain of events which led to the injury. In short, the record does not support summary judgment in its favor; therefore, we reverse and remand.
HERSEY and DELL, JJ., concur.